UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| STERLING COMPUTERS CORPORATION, <br><br> Plaintiff, <br><br> vs. <br><br> BILLIE JO FLING and KELYN TECHNOLOGIES, LLC, <br><br> Defendants. | 4:19-CV-04137-KES <br><br><br> ORDER GRANTING MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION AS TO BILLIE JO FLING |

Plaintiff, Sterling Computers Corporation, moves for a temporary restraining order or preliminary injunction enjoining defendants, Billie Jo Fling and Kelyn Technologies, LLC, from engaging in a number of activities that allow Kelyn to benefit from confidential customer information Fling gained during her employment with Sterling. Docket 7 at 2-3. Kelyn filed a motion to dismiss based on lack of personal jurisdiction. Docket 18. The parties are doing limited jurisdictional discovery on this issue and the court reserves ruling on the motion for temporary restraining order and preliminary injunction with regard to Kelyn until the motion to dismiss is resolved. Fling filed an answer to Sterling's complaint and a response in opposition to the temporary restraining order and preliminary injunction. Dockets 26, 27. For the following reasons, the motion for a temporary restraining order and preliminary injunction is granted as to Fling.

## BACKGROUND

Sterling is an information technology solutions company based in North Sioux City, South Dakota. Docket 8 at 1. Its clients include the federal government, state and local governments, private corporations, and education entities. *Id.* at 1-2. It holds several federal contracts across defense, civilian, and intelligence sectors, and has obtained awards, certifications, and security clearances to service these contracts. *Id.* at 2. Because of Sterling's relationship with numerous agencies, it can provide efficient services and is "uniquely position[ed] . . . to provide its clients with comprehensive solutions at an industry-best value." *Id.* Sterling uses its long-standing relationships as a competitive advantage in its field. *Id.*

Sterling holds confidential information about its clients, their contracts, and its sales solutions. *Id.* at 3. Its sales representatives access this confidential information via Sterling's Salesforce account, an online database that holds customer data. *Id.* Sterling's Salesforce database is accessible online from anywhere its salespeople work. *Id.* The database holds "crucial information regarding Sterling's trade secrets." *Id.* Sterling takes pains to keep this confidential information secret. *Id.* The database is only accessible to designated current employees who must have a unique username and password to access it. *Id.* at 4. When a Sterling employee is terminated, his or her access to Salesforce is immediately terminated as well. *Id.*

Fling began working as an account manager at Sterling on April 25, 2011. Docket 1 ¶ 36. As a member of Sterling's sale team, Fling had access to

its Salesforce database. *Id.* ¶ 37. She worked closely with key Sterling customers, including the Missile Defense Agency, Red Hat, Inc., Jacobs Technology, and other defense agencies during her employment. *Id.* ¶ 47. She had access to confidential and proprietary information about these clients' profiles, preferences, and specifications via the Salesforce database. *Id.* According to Sterling, Fling admitted that information contained in the Salesforce database "absolutely belongs to Sterling." *Id.* ¶ 49.

In 2012, Fling signed and acknowledged receipt of Sterling's employee handbook. *Id.* ¶ 38; Docket 1-1 at 3. The handbook contained a non-disclosure policy stating that Sterling "must protect confidential business information and trade secrets." Docket 1 ¶ 40; Docket 1-1 at 4. It also contained a confidential information policy stating that Sterling employees must handle confidential information with great care, and that termination of employment does not change this obligation. Docket 1 ¶ 41. It named several examples of confidential business information and trade secrets, including customer lists, customer preferences, marketing strategies, and pending projects and proposals. Docket 1-1 at 4.

Fling also signed an employment agreement containing a covenant not to compete. Docket 1 ¶ 45. The covenant placed certain restrictions on Fling for one year following the end of her employment. Docket 1-2 at 6. The restrictions included prohibitions on Fling soliciting business from or performing services for any customers of Sterling with whom Fling had contact as a Sterling employee. *Id.* The agreement, which Fling signed for a second time on June 16,

2015, also contained a confidentiality provision requiring Fling to return any confidential Sterling information when her employment was terminated. Docket 1 ¶ 44.

On July 18, 2018, Fling sent an email from her Sterling email to "bjkover@yahoo.com," an email on record at Sterling as Fling's personal account. Hearing Exhibit 6. The email contained reports generated from Sterling's Salesforce database listing contacts, sales numbers, and pipeline information. *Id.* On September 10, 2018, Fling sent an email to the same Yahoo account containing a Salesforce report listing activity by sales representative and customer. *Id.* On November 15, 2018, Fling requested a copy of the signed handbook and covenant not to compete from Sterling's director of human resources. Hearing Exhibit 3. She stated that she had accidentally shredded her own copy. *Id.*

On or around November 20, 2018, Fling terminated her employment with Sterling. Docket 1 ¶ 50. At the time of termination, Fling "expressly or impliedly agreed not to use any Sterling confidential information for her own benefit or for any improper purpose, including . . . to benefit a subsequent employer." *Id.* ¶ 51. Fling acknowledged the existence and enforceability of the non-compete provision in her employment contract at the time of termination. *Id.* ¶ 52. She attempted to negotiate a release of her obligations under the provision, but Sterling did not agree to the release. *Id.* Rather, Sterling reminded Fling of her obligation under the contract via a letter dated December 3, 2018. *Id.* ¶ 53. Sterling's president and CEO, Brad Moore, told Fling via

4

email on December 26, 2018, that he expected her to honor the agreements. Hearing Exhibit 4.

In or around January 2019, before the expiration of the noncompete agreement, Fling began working at Kelyn. Docket 1 ¶ 54. Kelyn is a competitor of Sterling. *Id.* On May 22, 2019, Sterling received an email inadvertently sent to Fling's former Sterling email account. *Id.* ¶ 55. Through the email, Sterling learned that Fling was working with Sterling customers while employed by Kelyn. *Id.* These customers included Red Hat, Jacobs Technology, and the Missile Defense Agency. *Id.* Sterling alleges that Fling is using its confidential information to improperly solicit these and other Sterling customers. *Id.* The information Fling is allegedly using is not "publicly available or readily ascertainable." *Id.* ¶ 57.

On or around May 30, 2019, Sterling reminded Fling of her obligations under the employee handbook and non-compete agreement. *Id.* ¶ 60. Fling did not respond. *Id.* ¶ 63. Sterling states that its "trade secrets, confidential information, and goodwill are at risk" because Fling is using Sterling's confidential information to Kelyn's and her own benefit. *Id.* ¶ 65. It further states that it is at risk of irreparable harm because of Fling's continued use of Sterling's confidential information and violation of the non-compete agreement. Docket 8 at 14-17.

Sterling filed its complaint on August 6, 2019, and its motion for temporary restraining order and preliminary and permanent injunction on August 22, 2019. Dockets 1, 7. The complaint alleged breach of contract with

regards to both the confidential information provision and non-compete provision, misappropriation of trade secrets in violation of South Dakota state law, unfair competition, and tortious interference with a business expectancy against Fling. Docket 1 ¶¶ 72-127. The temporary restraining order and preliminary injunction motion sought to (1) enjoin Fling from her continued employment with Kelyn, or in the alternative, enjoin Fling from, directly or indirectly, working with Sterling clients or customers with whom she had actual contact while employed with Sterling for a period of one year from November 20, 2018; (2) enjoin Fling from directly or indirectly engaging in, assisting, or working for any person, activity, business, concern, interest, or venture in competition with Sterling other than Kelyn for one year from November 20, 2018; (3) enjoin Fling from accepting employment or acting as a consultant for any Sterling client or customer with whom Fling had actual contact while employed with Sterling for a period of one year from November 20, 2018; (4) compel Fling and Kelyn to return all Sterling confidential or proprietary information, property, or trade secrets in their custody, possession, or control; (5) enjoin Fling from disclosing any Sterling confidential trade secrets to which she became privy during her employment; (6) order Fling and Kelyn to cease use of any and all Sterling confidential or proprietary information or trade secrets in their possession; (7) enjoin Fling and Kelyn from soliciting or rendering marketing or sales to any Sterling customers with whom Fling had actual contact while employed with Sterling; (8) enjoin Fling from encouraging, recommending, or suggesting to any employee, contractor,

vendor, or customer to end or reduce its relationship with Sterling. Docket 7 at 2-3.

On September 17, 2019, Fling's counsel sent an email to Sterling's counsel offering to stipulate to all but the final two of the eight requested forms of relief. Docket 27-1. For the seventh and eighth requests, Fling's counsel offered to stipulate to the terms if Sterling was willing to make the requests contingent on the same date restriction used in the other requests, one year from November 20, 2018. *Id.* at 4. Sterling rejected the proposed stipulation. *Id.* at 1. Sterling then filed a reply to Fling's opposition and a motion to strike evidence of the email offer to stipulate to the requested preliminary relief. Dockets 37, 38.

## LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy and the burden of establishing the propriety of an injunction is on the movant." *Roudachevski v. All-Am. Care Ctrs., Inc.*, 648 F.3d 701, 705 (8th Cir. 2011) (citing *Watkins, Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003)). To determine whether preliminary relief such as a preliminary injunction or a temporary restraining order is appropriate, the court considers the following factors: " '(1) the threat of irreparable harm to the movant; (2) the state of the balance between this harm and the injury that granting the injunction will inflict on [the nonmovant]; (3) the probability that [the] movant will succeed on the merits; and (4) the public interest.' " *Mgmt. Registry, Inc. v. A.W. Cos., Inc.*, 920 F.3d 1181, 1183 (8th Cir. 2019) (alterations in original) (quoting *Dataphase Sys., Inc. v. CL Sys., Inc.*, 640

F.2d 109, 113 (8th Cir. 1981)). The *Dataphase* test for preliminary injunctive relief is a flexible analysis. *Hubbard Feeds, Inc. v. Animal Feed Supplement, Inc.*, 182 F.3d 598, 601 (8th Cir. 1999). Thus, when weighing these factors, "no single factor is in itself dispositive[.]" *Calvin Klein Cosmetics Corp. v. Parfums de Coeur, Ltd.*, 824 F.2d 665, 667 (8th Cir. 1987). "[A]ll of the factors must be considered to determine" whether the balance weighs toward granting the injunction. *Id.*

## DISCUSSION

### I. The Probability of Success on the Merits

The first *Dataphase* factor focuses on the probability that the movant will succeed on the merits. "Success on the merits has been referred to as the most important of the four factors." *Roudachevski*, 648 F.3d at 706. Probability of success on the merits in this context means that the moving party must show that it has "a 'fair chance of prevailing' " on the merits. *Kroupa v. Nielsen*, 731 F.3d 813, 818 (8th Cir. 2013) (quoting *Planned Parenthood Minn., N.D., S.D. v. Rounds*, 530 F.3d 724, 732 (8th Cir. 2008) (en banc)). A "fair chance of prevailing" does not necessarily mean a greater than fifty percent likelihood of prevailing on the merits of the claim. *Planned Parenthood*, 530 F.3d at 731-32. Thus, "[a]t the early stage of a preliminary injunction motion, the speculative nature of this particular inquiry militates against any wooden or mathematical application of the test." *United Indus. Corp. v. Clorox Co.*, 140 F.3d 1175, 1179 (8th Cir. 1998).

### A. Contract Claims

Sterling must demonstrate its likelihood of success on the merits of its breach of contract claims. It alleges Fling breached two separate agreements: first, the non-disclosure agreement, and second, the non-compete agreement. Docket 1 ¶¶ 72-76, 77-81. A breach of contract claim requires "(1) an enforceable promise; (2) a breach of the promise; [and] (3) resulting damages." *Guthmiller v. Deloitte & Touche, LLP*, 699 N.W.2d 493, 498 (S.D. 2005). Sterling claims that when Fling signed her employment agreement, she promised not to disclose Sterling's proprietary information and promised not to compete for one year following the termination of her employment with Sterling. Docket 8 at 19.

A covenant not to compete is, generally, an unlawful restraint on trade. *McKie Ford Lincoln, Inc. v. Hanna*, 907 N.W.2d 795, 799 (S.D. 2018). But South Dakota state law allows non-compete agreements when an employee agrees to not engage in the same business or profession as an employer for two or fewer years following the employee's termination and not to solicit existing customers of the employer within a specified area for any period not to exceed two years. SDCL § 53-9-11. Here, Fling agreed to not compete with Sterling for one year following her termination. Docket 1 ¶ 45. Furthermore, Sterling alleges that Fling acknowledged the validity of the non-compete agreement by attempting to negotiate a release. *Id.* ¶ 52. She was also reminded of the terms of the agreement shortly after her departure, via the email from Moore. Hearing Exhibit 4. Thus, Sterling demonstrated that the non-compete agreement is likely an enforceable promise under South Dakota law.

A non-disclosure agreement is not subject to the same restrictions as a non-compete agreement. *1st Am. Sys., Inc. v. Rezatto*, 311 N.W.2d 51, 57 (S.D. 1981). Thus, because Sterling alleges that Fling expressly agreed not to use Sterling's confidential information for her own benefit or the benefit of a future employer, Sterling showed that the nondisclosure agreement between it and Fling is likely valid.

Sterling alleges that Fling breached the covenant not to compete by working for a direct competitor of Sterling and engaging directly with Sterling's former clients. Docket 8 at 19-20. The covenant not to compete prohibited Fling from performing services or soliciting business from any customers of Sterling with whom Fling had contact as a Sterling employee. Document 1-2 at 6. Sterling alleges that it found out via the May 2019 email that Fling was working with Red Hat, Inc., Jacobs Technology, and the Missile Defense Agency on Kelyn's behalf. Docket 1 ¶ 55. These entities are all customers of Sterling, who Fling worked with while employed there. *Id.*

Sterling alleges that Fling breached the non-disclosure agreement by using Sterling's confidential information to benefit Kelyn. Docket 8 at 19-20. It supports this allegation by stating that Fling possesses confidential information that she sent from her Sterling email account to her personal email account, including customer contact information and pipeline information. Hearing Exhibit 6. It also alleges that Fling knew this information was confidential because the agreement she signed listed pending projects and proposals and customer lists as examples of confidential and proprietary business

information. Docket 1-1 at 4. These facts state a breach of the agreements that Fling entered into as a Sterling employee. As such, Sterling is likely able to show a breach by Fling.

Sterling claims that it suffered reputational and financial harm because of Fling's use of Sterling's confidential information and violation of the noncompete agreement. Docket 1 ¶¶ 65-71. It claims that if a competitor, like Kelyn, obtained Sterling's confidential information, it would be able to unfairly compete by using the confidential information to contact Sterling customers and undercut Sterling. *Id.* ¶ 67. It further alleges that because its clients take privacy and security very seriously, Fling's use of Sterling's information could damage Sterling's reputation and bring about business loss or other penalties. *Id.* ¶ 68. Thus, Sterling is likely to show that damages will flow from Fling's contract breach. Sterling has a fair chance of succeeding on the merits of its breach of contract claims.

### B. Misappropriation of Trade Secrets

South Dakota law allows injunctions as remedies to prevent actual or threatened misappropriation of trade secrets. SDCL § 37-29-2. A trade secret is "information . . . that derives independent economic value" because of its secrecy and "is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." SDCL § 37-29-1(4). Misappropriation includes disclosure of a trade secret by a person who had a duty to maintain its secrecy. SDCL § 37-29-1(2).

Here, Sterling claims that the information Fling possessed about its customers derives independent value because the information gives it unique advantages over competitors and allows it to maintain a strong relationship with customers. Docket 1 ¶ 66. The customer information would allow another entity to unfairly compete with Sterling were it to be released. *Id.* ¶ 67. Furthermore, Sterling notes the reasonable steps it took to protect the confidential information, including requiring nondisclosure agreements of its employees and limiting access to its Salesforce database. *Id.* ¶¶ 27-29. Finally, Sterling alleges that Fling had a duty to maintain the secrecy of confidential customer information. *Id.* ¶¶ 38-41. Sterling thus demonstrates a fair chance of succeeding on the merits on its misappropriation of trade secrets claim.

### C. Tortious Interference

A claim of tortious interference with business expectancy requires "(1) the existence of a valid business relationship or expectancy; (2) knowledge by the interferer of the relationship or expectancy; (3) an intentional and unjustified act of interference on the part of the interferer; (4) proof that the interference caused the harm sustained; and (5) damage to the party whose relationship or expectancy was disrupted." *Tibke v. McDougall*, 479 N.W.2d 898, 908 (S.D. 1992).

Sterling has alleged each of these elements. First, it alleges that it had a longstanding business relationship with the Missile Defense Agency, Red Hat, Jacobs Technology, and other entities that Fling later worked with at Sterling.

12

Docket 1 ¶ 47. Second, it alleges Fling knew about these relationships because she worked closely with these customers while employed by Sterling. *Id.* Third, Sterling alleges that Fling interfered with those relationships by violating contracts between her and Sterling. *Id.* ¶¶ 56, 57. It specifically alleges that Fling worked with Red Hat, Jacobs Technology, and the Missile Defense Agency while employed by Kelyn. *Id.* ¶ 47. Fourth, Sterling alleges this action caused irreparable harm, as discussed in greater detail below. *Id.* ¶¶ 65-71. Fifth, Sterling alleges reputational damage because of the interference. *Id.* Thus, Sterling has a fair chance of prevailing on the merits of its tortious interference with business expectancy claim.

## II.     Threat of Irreparable Harm

The second *Dataphase* factor is that the movant must show that it is "likely to suffer irreparable harm in the absence of preliminary relief[.]" *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). A movant's failure to demonstrate irreparable harm is sufficient to deny a motion for preliminary injunction. *Grasso Enters., LLC v. Express Scripts, Inc.*, 809 F.3d 1033, 1040 (8th Cir. 2016) (citing *Watkins Inc.*, 346 F.3d at 844). "The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm." *Sampson v. Murray*, 415 U.S. 61, 90 (1974) (quotation omitted). "Irreparable harm occurs when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an

13

award of damages." *Gen. Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 319 (8th Cir. 2009).

"Loss of intangible assets such as reputation and goodwill can constitute irreparable injury." *United Healthcare Ins. Co. v. AdvancePCS*, 316 F.3d 737, 741 (8th Cir. 2002). *See also Rogers Grp., Inc. v. City of Fayetteville*, 629 F.3d 784, 789-90 (8th Cir. 2010) ("We have previously held that a district court did not err when finding that a loss of goodwill among customers was sufficient to establish a threat of irreparable harm."); *General Mills, Inc. v. Kellogg Co.*, 824 F.2d 622, 625 (8th Cir. 1987) (finding irreparable harm where "intangible assets such as reputation and goodwill" are at risk).

Here, Sterling alleges that Fling's use of confidential information and breach of the non-compete agreement pose "an imminent threat of irreparable harm." Docket 8 at 17. Sterling notes that it relies on confidential information to adequately provide services to its clients. Docket 1 ¶ 66. It further alleges that its federal customers place a high value on Sterling's ability to maintain confidentiality. *Id.* ¶ 68. Furthermore, it alleges that Fling continues to possess Salesforce reports containing customer data and Sterling's proprietary information because she sent them to her personal email account before terminating her employment. Hearing Exhibit 6. Sterling's customers who know their data continues to be compromised may hold a lesser opinion of its security protocols than they otherwise would. Thus, a breach of confidentiality, like that alleged here, is likely to shake customer confidence in Sterling and

14

permanently damage its reputation and goodwill. Such damage is sufficient to constitute irreparable harm.

### III. Balance of the Hardships

The third *Dataphase* factor for obtaining a preliminary injunction requires plaintiffs to establish that their irreparable harm is greater than the hardship that a preliminary injunction would cause defendants. *Sturgis Area Chamber of Commerce v. Sturgis Rally & Races, Inc.*, 99 F. Supp. 2d 1090, 1101 (D.S.D. 2000). Here, as discussed, Sterling stands to face permanent harm to its goodwill and reputation among its customers if Fling continues to use confidential data.

Fling has not presented evidence that she could suffer harm if the injunction is entered. Any harm Fling might face results from Fling's breach of her contracts with Sterling. *See Perfetti Van Melle USA v. Midwest Processing, LLC*, 135 F. Supp. 3d 1015, 1020 (D.S.D. 2015) (finding that a defendant's harm was minor when it only deprived the defendants of "further profit that they [were] not entitled to make[.]"). Thus, the harms to Sterling in the absence of a preliminary injunction outweigh those Fling stands to suffer if the injunction is issued.

### IV. Public Interest

The public interest is the final *Dataphase* factor the court must balance in determining whether a preliminary injunction should be issued. Here, the public interest weighs in favor of protecting proprietary information and trade

secrets and enforcing legal non-compete agreements. South Dakota law authorizes non-compete agreements like the one between Fling and Sterling. SDCL § 53-9-11. Also, it is in the interest of public policy to enjoin those committing business torts from continuing to reap the rewards of their misdeeds. Thus, public policy favors granting the injunction here.

## CONCLUSION

Sterling has a fair chance of prevailing on the merits of its claims and faces a likelihood of irreparable harm if the preliminary injunction and temporary restraining order are not granted. The balance of harms is in Sterling's favor. Finally, public policy favors granting the injunction. Thus, it is

ORDERED that Sterling's motion for temporary restraining order and preliminary injunction (Docket 7) is granted. The injunction is granted against Billie Jo Fling as follows:

1. Fling is enjoined from working directly or indirectly with the Missile Defense Agency, Red Hat, Inc., Jacobs Technology, any Department of Defense agency, or any other Sterling client or customer with whom she had actual contact while employed with Sterling for a period of one year from November 20, 2018;

2. Fling is enjoined from directly or indirectly engaging in, assisting, or working for any person, activity, business, concern, interest, or venture in competition with Sterling other than Kelyn for a period of one year from November 20, 2018;

3. Fling is enjoined from accepting employment or acting as a consultant for, or soliciting business from or on behalf of the Missile Defense Agency, Red Hat, Inc., Jacobs Technology, or any Department of Defense agency, or any Sterling client or customer with whom Fling had actual contact while employed with Sterling for a period of one year from November 20, 2018;
4. Fling is compelled to return all Sterling confidential or proprietary information, property, and/or trade secrets in her custody, possession, or control, including all documents and materials of any nature pertaining to her work with Sterling, whether in electronic or other form, to Sterling;
5. Fling is enjoined from disclosing any Sterling confidential or proprietary information and/or trade secrets to which she became privy during her employment with Sterling;
6. Fling is ordered to cease the use of any and all Sterling confidential or proprietary information and/or trade secrets in her possession;
7. Fling is enjoined from soliciting and/or rendering marketing or sales services of any kind to any Sterling customers with whom Fling had actual contact while employed with Sterling until one year from November 20, 2018; and
8. Fling is enjoined from encouraging, recommending, or suggesting to any employee, contractor, vendor, or customer to disengage, terminate, or

reduce its relationship with Sterling until one year from November 20, 2018.

Dated October 11, 2019.

BY THE COURT:

/s/ *Karen E. Schreier*
KAREN E. SCHREIER
UNITED STATES DISTRICT JUDGE